# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## JANUARY TERM, 1869.

| | |
|---|---|
| 36 | 489 |
| 112 | 23 |
| 36 | 489 |
| 118 | 471 |
| 36 | 489 |
| 123 | 490 |

JOHN SATTERLEE, Administrator, with the will Annexed, of the Estate of WILLIAM S. REESE, Deceased *v.* GEORGE D. BLISS, JOHN O'CONNELL, HENRY A. COBB, HENRY O. GOUGH, WILLIAM PALMER, LEONARD MOSS, GEORGE W. BURNETT, and JOAQUIN PEREA.

Deed as Evidence.—When a deed, admissible in evidence, refers to another deed as containing a description of the premises conveyed, such other deed is also admissible in evidence as explanatory of the first.

Evidence Explanatory of Deed.—When one of the parties introduces in evidence a deed to which the other is a stranger, the other party may show the purpose for which the deed was given. But if the deed as to the question at issue has the same effect as though it was a deed in partition, it is immaterial to show whether or not it was intended to be a deed of partition, and no injury results from not being allowed to show that it was such in fact.

Stamp on Probate of Wills.—It is immaterial whether the stamp required on probate of wills is affixed to the will upon its being admitted to probate, or to the certificate of proof thereof attached, or to the letters testamentary with the will annexed.

Attaching Stamp on Probate of Will in Collateral Action.—When the papers in the matter of an estate are offered in evidence in a collateral action, the

Points decided.

Court in which they are offered cannot review the action of the Probate Court upon the question whether the stamp affixed upon the probate of the will was such as the value of the estate required. The presumption is that the Probate Court passed upon the question of the value of the estate, and its decision is final.

TESTIMONY OF ATTORNEY AS TO CLIENT'S DECLARATIONS.—The rule not permitting an attorney to testify to communications made to him by his client, as such, does not extend so far as to prohibit the attorney from stating by whom he was employed; neither does the rule prevent the attorney from testifying to communications made to him by his client, unless they are confidential communications made by the client in the course and for the purposes of the employment of the attorney.

IDEM.—The rule excluding the testimony of an attorney as to confidential communications made to him by his client, must be strictly construed, as it has a tendency to prevent a full disclosure of the truth.

IDEM.—The Supreme Court will not reverse a judgment because the District Court admitted testimony of the attorney as to communications made to him by his client, if the only objection made at the trial was that it is irrelevant and immaterial.

OBJECTION TO TESTIMONY.—A general objection to all the testimony a witness may give, made on the ground that he was the attorney of defendant, is not sufficiently specific to be available on appeal.

IDEM.—A party offering testimony objected to by the other party is entitled to have the particular portion of the testimony objected to pointed out and the specific ground of objection stated.

TESTIMONY OF PARTY WHEN OTHER PARTY REPRESENTS ONE DECEASED.—The statute prohibiting a party from being a witness "where the adverse party, or the party for whose immediate benefit the action is prosecuted, or defended, is the representative of a deceased person," etc., extends to all cases, even where there was no privity or connection between him and the plaintiff, or those through whom he claims.

SUBSTANTIAL FENCE, AND ACTUAL POSSESSION OF LAND.—The Court cannot say that a fence built in San Francisco in 1850, and made of posts and boards, two boards and a cap high, was not a substantial fence, or that this in connection with building and occupying a house within it, and exercising control over the land, did not constitute an actual possession within the meaning of the Van Ness Ordinance. The testimony was sufficient to require its submission to the jury.

WHO TURNED OUT UNDER JUDGMENT IN EJECTMENT.—Persons who are on land in the character of employés of a defendant in ejectment at the time the suit is commenced against him, are properly turned out under the writ if the suit goes against him; and no subsequent entry of such persons under said defendant, or in collusion with him, or under the title determined in that action, will be available to protect them.

JUDGMENT IN EJECTMENT.—A judgment in ejectment binds the parties and their privies, and estops them from denying that the plaintiff was entitled to the possession of the premises at the time of its rendition.

IDEM.—Privies, within the meaning of the rule, are those who enter-under the defendant in ejectment, or in collusion with him.

JUDGMENT AS EVIDENCE.—A judgment in ejectment may be introduced in evi-

dence in an action to recover the same land between the same plaintiff and a party in privity with the defendant.

TENANT OF DEFENDANT IN EJECTMENT.—A tenant of the defendant in ejectment, who acquired his lease before the commencement of the suit, is not estopped as to his term by a judgment in the action obtained against his lessor.

ERROR NOT MATERIAL.—If the Court charges the jury erroneously upon a proposition of law which does not arise in the case, either upon the pleadings or the evidence, and which could not affect the result, the error is immaterial, and will not cause a reversal of the judgment.

AMENDMENT OF RECORD IN SUPREME COURT.—The Supreme Court will not amend a statement by adding thereto facts which occurred in the Court below during the trial. The record in the Supreme Court must remain as settled by the Court below.

APPEAL from the District Court, Fifteenth Judicial District, City and County of San Francisco.

The testimony tended to show that in March, 1849, Jonathan D. Stevenson claimed a tract of land of about seventy-seven acres in San Francisco, west of any land then surveyed or occupied, and had the same surveyed, and put two small houses thereon, which he kept occupied by men; that in April, 1850, Stevenson took in with him in the claim Satterlee, the plaintiff, Howard, Hastings, and Morse, and that Parsons afterwards took the place of Morse; that in May, 1850, the parties inclosed the land with a fence made of posts and boards, and either two or three boards high, with a cap thereon; that early in 1850 one Ensign, as the tenant of the parties, built a house on the land and moved into it, and cultivated five or six acres, and exercised control over the whole tract; that in 1853 David and Dennis Mahoney entered upon and took possession of a portion of the tract, which portion included the demanded premises; that the Mahoneys erected a corral and slaughter house on the tract, and Bliss and O'Connell, two of the defendants, were there using the slaughter house with the Mahoneys; that in October, 1854, Reese had acquired the title of his cotenants to that part of the Stevenson claim embraced in the demanded premises, and was himself occupying the ground not in the possession of the Mahoneys.

In October, 1854, Reese commenced suit in ejectment against the Mahoneys, and recovered judgment against them in 1861. They appealed to the Supreme Court, and the judgment was affirmed, and the remittitur filed in the Court below February 14th, 1863, and a writ of possession was placed in the Sheriff's hands on the same day. On the sixteenth of February, two days after, (the writ not having been served,) the Mahoneys gave Bliss and O'Connell a deed of the land. Bliss and O'Connell procured a delay in the service of the writ by obtaining an injunction, but the same was finally served April 11th, 1863. Reese immediately divided the land into lots and blocks according to the map of the city. He died May 25th, 1863, and one McMinn was appointed his executor July 24th, 1863.

The testimony also tended to show that Reese, from the time of the service of the writ until his death, and his executor afterwards, remained in possession of the land, until November 28th, 1863, when Bliss and O'Connell again entered upon and took possession of the demanded premises. The other defendants occupied portions of the land as tenants of Bliss and O'Connell.

McMinn ceased to be executor May 13th, 1865, when the plaintiff, Satterlee, was appointed administrator with the will annexed in his place.

This action was commenced August 13th, 1864. The demanded premises are described in the complaint as "beginning at a point on the southerly line of Jackson street, one hundred feet westwardly from the intersection of said southern line of Jackson street with the westerly line of Polk street; thence running south eight degrees east to the northerly line of Washington street; thence running westwardly along the northerly line of Washington street nine hundred and ninety-five feet; thence running northerly at right angles with Washington street two hundred and seventy-five feet to Jackson street; thence running eastwardly along the southerly line of Jackson street ten hundred and ninety-five feet to the place of beginning."

The complaint was in the usual form, averring possession in the plaintiff on the 28th day of November, 1863, and an entry and ouster by defendants on that day. It was not verified. The answer was a general denial, and a plea of the Statute of Limitations, and it contained an averment of title in fee in the defendants Bliss and O'Connell.

On the trial the plaintiff offered in evidence a deed from John Satterlee to his testator, Reese, dated December 22d, 1853, and conveying all the interest of the grantor to a tract of land in San Francisco described by metes and bounds, and also described in the deed as containing seventy-seven and fifty-one one hundredths acres, more or less, and as "being the same premises conveyed to one James P. Howard, now deceased, by Jonathan D. Stevenson, by deed bearing date the 28th day of May, 1850, and recorded in the office of the Recorder of San Francisco, in Liber B of Deeds, page 99."

The plaintiff then offered in evidence the deed from Stevenson to Howard above referred to. By this deed Stevenson bargained and sold to Howard "three undivided one fourth parts" of the same premises described in the deed from Satterlee to Reese.

The plaintiff's counsel stated that he offered the deed from Stevenson to Howard in evidence because it was referred to in the deed from Satterlee to Reese, and by the reference there made it might be inferred that by this deed from Stevenson to Howard, Stevenson had, in 1850, sold to Howard all his interest in the land. The defendants objected to the deed as incompetent and irrelevant, no predicate having been laid for it. The Court overruled the objection.

Testimony was offered tending to show that just before the land was fenced, in 1850, Stevenson took in with him in the claim Satterlee, Hastings, Morse, and Howard, with the understanding that Stevenson should retain one undivided one fourth, and the others should pay for fencing the whole tract, and own the other three fourths, undivided, in the following proportion: Howard, one eighth; Morse, one eighth;

Hastings, one fourth; and Satterlee, one fourth. The testimony tended to show that this arrangement was carried out.

The plaintiff offered in evidence a deed from Stevenson to Reese, dated April 22d, 1854, which is a deed of grant, bargain, and sale of a part of the Stevenson claim, described in the deed by metes and bounds, which bounds included the demanded premises. The defendants offered to show by parol that this deed was in fact a partition between the parties, but the Court refused to admit the testimony.

The plaintiff also offered in evidence the proceedings in the Probate Court in the matter of the estate of Reese. The order admitting the will to probate was not stamped, neither was the petition for probate of will stamped. The order of publication of time appointed for probate of will, and the citation of heirs and parties interested, and the letters testamentary, were stamped. The defendants objected to the admission of the papers in evidence because the order admitting the will to probate was not stamped, but the Court overruled the objection.

O'Connell and Bliss, in 1863, after they obtained the deed of the Mahoneys, commenced a suit against Reese to enjoin the service of the writ of possession, and procured a temporary injunction. In this suit, W. M. Pierson was an attorney for O'Connell and Bliss.

The plaintiff called as a witness Pierson, who testified as follows:

WILLIAM M. PIERSON, called and examined by plaintiff, testified as follows:

*Question.*—You are an attorney at law in this city, are you not?

*Answer.*—Yes, sir. I have been practicing law several years; I am a partner of H. H. Haight, of the firm of Haight & Pierson.

Q.—Were your firm employed as attorneys in the case of O'Connell and Bliss against John S. Ellis, Sheriff, and William S. Reese, in the Twelfth District Court—Case No. 10,458?

A.—Yes, sir. (The record was here shown witness.) This is the case.

Q.—Will you state whether you know David Mahoney, the defendant, and about how long have you known him?

A.—About seven years.

Q.—Who employed you to commence that suit?

A.—The first time that I was talked to about commencing the suit was, I think, the evening before the filing of the complaint, and my impression is that Walter H. Tompkins came in and spoke to me first; afterwards David Mahoney came in and Walter H. Tompkins together.

Q.—Who employed you to commence that suit, and gave you instructions in regard to it?

A.—The instructions were given by David Mahoney and Mr. Tompkins. I drew the complaint under their instructions, and Mr. Bliss swore to it, I think, on the following morning.

Q.—Were you acquainted with Mr. Bliss or O'Connell prior to Bliss' coming into your office and signing that paper?

A.—I was acquainted with Bliss, but not O'Connell; I had not seen Mr. Bliss in relation to that suit, to the best of my recollection, until he came in to verify to the complaint. I never saw Mr. O'Connell, to the best of my recollection. I do not know him at all up to the present time.

Q.—I understood you to say that the papers were all drawn and prepared for signature before you saw Mr. Bliss at all about it?

A.—That is my recollection. Yes, sir.

Q.—During the pendency of that suit did David Mahoney make frequent visits to your office in relation to it?

A.—He did. My services in the matter were charged to David and Dennis Mahoney.

Q.—Just look at the undertaking on injunction in that same suit. Who executed the undertaking?

A.—David and Dennis Mahoney.

Q.—Look at the appeal bond and see the signature of David Mahoney, and state whether this is his signature that is signed there—of David Mahoney?

A.—It is the signature of David Mahoney.

There was here shown to the witness an undertaking on injunction, and an undertaking upon appeal, each in the usual form, in the case of *George D. Bliss* and *John O'Connell* v. *John S. Ellis* and *William S. Reese*, in Twelfth District Court, which suit was brought to restrain the defendants

therein from executing the writ of possession in the suit of *Reese* v. *Dennis Mahoney* and others, issued from said Twelfth District Court, and the premises described in said suit included all the premises in controversy in this action.

Defendants' counsel objected to all this testimony, and moved to strike it out as irrelevant and immaterial.

The Court denied the motion; to which ruling the defendants duly excepted.

Q.—Who paid the costs of it in the second suit?  Can you tell by reference to your books?

A.—It is barely possible.

Q.—Did the firm advance the money?

A.—It is quite likely—although I am not positive.

*Cross Examination by Defendants' Counsel.*  Q.—You say you got directions from Walter H. Tompkins and David Mahoney?

A.—Yes, sir.

The defendants moved to strike it out as irrelevant and immaterial.  The Court denied the motion.

The plaintiffs also called as a witness, Walter H. Tompkins, whose examination was as follows:

"I am an attorney.  I have been practicing in this city and county several years.  I know David Mahoney, George D. Bliss, and John O'Connell, defendants in this suit."

Defendants' counsel objected to this testimony as immaterial and irrelevant, and as requiring of the witness what he knows by no means except through his professional relation with his clients. The Court overruled the objection. Defendants' counsel duly excepted.

Witness resumes: I remember the suit No. 10,458 in the Twelfth District Court, of O'Connell against John S. Ellis, Sheriff of the City and County of San Francisco, and William S. Reese.  I was connected with it.  I think I visited Mr. Pierson, in company with David Mahoney, on this subject. I either went with him or went alone.  I understood at that time, and I have ever since understood, that David Mahoney employed me in that suit; I at least relied on him for my pay.  I have been thinking over it to-day, and perhaps I may have the same reason for thinking that Bliss and O'Connell employed me about it; though David Mahoney talked about it first, and Dennis Mahoney talked with me; but I looked to David Mahoney for my pay, inasmuch as I have brought a suit against him, and I have looked to him only

for my pay thus far. I do not know that he ever told me he would pay me, but he spoke to me about the suit, and I looked to him for the pay. How I came to go to Haight & Pierson, as near as I can remember now, was: I was going to Sacramento. Mr. Pierson is a very intimate friend of mine, and I have been acquainted with him intimately for a long time; and I was anticipating the execution of this writ, or it was talked of, and I was suddenly called to Sacramento. I went to speak to him about it, to have the suit brought; we talked about how the suit should be brought. I think Mahoney accompanied me to the office of Mr. Pierson. At any rate, he talked to me, and was perhaps the only one who talked to me at that time. I think he accompanied me. Mr. Pierson attended to that suit afterwards in Court. I don't know but I had something to do with matters. Yes, sir; I think I did in the Twelfth District Court. The argument on the injunction was made by Mr. Pierson. I was present, and we prepared it together; at least, I did something in it. I think he did the most of it. When the case was called for trial, I made the motion for continuance. I think so. I think he was there; and perhaps Mr. Sharp was there. I think I should know the affidavit on motion for a continuance, if I should see it. I have not a distinct recollection now who drew it. I can tell if I should see it. The only reason I spoke of Mr. Sharp was that I rarely ever do anything for the Mahoneys or Mr. Bliss without consulting Mr. Sharp, though I have no recollection of consulting him about this suit. I think now I drew that affidavit. [Taking the paper.] This is the affidavit on which the motion was made in that case. I drew it. During that litigation I considered myself as exclusively employed by Mr. Mahoney, but recollect now writing a note to Mr. Bliss to come and see me. I may also state that I considered that the Mahoneys had rights at that time, and I considered that Bliss had rights at that time. I think I have known David Mahoney about eight years—it may be less. I have never known about his business intimately; I know that he had been doing butchering—that is, slaughter house business. I do not know that I ever talked with him about his business. Prior to my becoming attorney for Mahoney, I do not know anything in relation to his claiming the land in controversy in this suit. I became his attorney shortly after I became acquainted with him, doing many things for him. I knew that he lived out there. I assisted Mr. Bergin in the County Court, and

helped to make up a statement for a new trial, in the case of McMinn, executor of Reese, against Bliss and O'Connell, for forcible entry and detainer.    Mr. Bergin was attorney of record, and did most of the work.

Q.—Who employed you in that suit? just look at these papers in that case—No. 3,945 in the County Court.

A.—I supposed there was only one; I understood that Mr. Mahoney did; I looked to him for my pay.

*Cross Examination.*—Q.—About the time of the suits referred to, were you one of the attorneys of Mahoney and Bliss and of Bliss and O'Connell, doing some of their business?

A.—Yes, sir.    That is, I had supposed Bliss and O'Connell were interested in the business I was doing for Mahoney; I had brought suit for Bliss and O'Connell about the time of these suits referred to, by the opposite counsel; I have known Bliss, I think, seven or eight years; during that time he and O'Connell have been doing business together on their own account—well, most of the time; I have not said that in every suit brought Mahoney has been interested with them; I do not know how long, but part of them at least; I do not know how long; I might know from suits that were brought.

*Re-direct Examination.*—I was acting in other suits brought about the same time these were—well, before and after. There was one suit I recollect distinctly—an attachment suit against a butcher here, or a replevin suit; I do not remember the name now; it must have been three years now, I think; the title of the suit was O'Connell against Matthews.

Defendants offered as a witness defendant Bliss, and claimed that although the plaintiff was the representative of Reese, yet inasmuch as the defendants did not claim through Reese or in privity with him or his grantors, that his testimony was admissible.    The Court refused to allow him to testify. The following was the first instruction asked by the defendants, (referred to in the opinion of the Court,) but refused by the Court:

"1st.  If the jury believe from the evidence that the plaintiff, his predecessors or grantors, for the period of five years—that being the term of the Statute of Limitations in this State—after the entry of Bliss and O'Connell upon the

demanded premises, voluntarily omitted or failed to sue
Bliss and O'Connell for recovery of the demanded premises,
then such omission or failure of the plaintiff, his prede-
cessors, or grantors, was an abandonment of all rights and
pretensions to the demanded premises as against the defend-
ants Bliss and O'Connell, and the jury must find for the
defendants Bliss and O'Connell."

The defendants introduced evidence tending to show that
one Eusebio Soto had claimed the land before Stevenson, and
traced title from him under conveyance from Soto to
McDuffee and Addison, dated May, 1850; conveyance from
McDuffee to William Wood, dated October 24th, 1851; con-
veyance from Addison to Dennis Mahoney, dated July 27th,
1858; and a conveyance from David and Dennis Mahoney,
dated February 16th, 1863, to the defendants George D. Bliss
and John O'Connell.

The plaintiff recovered judgment, and the defendants
appealed.

The other facts are stated in the opinion of the Court.

*T. I. Bergin,* and *S. A. Sharp,* for Appellants.

The Court erred in refusing to allow evidence to show that
the deed from Stevenson to Reese was in partition.

Writings may well be presumed to embody the intentions
of the parties, but not of strangers; hence they are always
at liberty to show what the fact was without regard to the
language of the writings, otherwise their rights might be
sported away.  (*The Overseers of Berlin* v. *Overseers of Nor-
wich,* 10 Johns. 229; *Whitbeck* v. *Whitbeck,* 9 Cow. 266;
*Franklin* v. *Dorland,* 28 Cal. 178; 1 Greenlf. Ev., Sec. 279;
2 Philip's Ev. 552, note 585 of the edition of 1868, with
cases cited.)

This was a most vital point for defendants, for a deed in
partition does not create or vest any new estate; it simply
operates as a severance of that theretofore held in common.

(*Doe* v. *Dixon,* 36 E. C. L. 571; *Doe* v. *Dixon,* 31 E. C. L.
452; *Drescher* v. *Allentown Water Co.,* 52 Pa. St. 225; *Ross* v.
*Pleasants,* 7 Harris, Pa. 168; *Goundie* v. *Northampton W. C.,*
7 Burr. 238.)

Upon severance of the tenancy in common by the deed
from Stevenson to Reese, they thereafter stood toward each
other like strangers. The possession of the one ceased to be
the possession of the other. Each, therefore, in order to
acquire the benefit of the Van Ness Ordinance, should have
had the actual occupation of his allotted portion required by
the ordinance. Constructive possession cannot override the
actual possession of these demanded premises by defendants.
(*Davis* v. *Perley,* 30 Cal. 643; *Polack* v. *Magrath,* 32 Cal. 15;
*Thompson* v. *Smith,* 28 Cal. 533; *Doolittle* v. *Tice,* 41 Barb.
182.)

The Court erred in admission of the judgment roll in
*Reese* v. *Mahoney et al.* The defendants were not parties nor
privies, and could not be affected by it. (*Tevis* v. *Ellis,* 25
Cal. 515; *Watson* v. *Dowling,* 26 Cal. 126; *Peabody* v. *Phelps,*
9 Cal. 213; *Fogarty* v. *Sparks,* 22 Cal. 142; *Ex parte Rey-
nolds,* 1 Caines, 500; *Ryers* v. *Wheeler,* 25 Wend. 437; 4
Hill. S. C. 466.)

*John Satterlee, in pro. per.*

The defendants Bliss and O'Connell were privies of the
Mahoneys, and the other defendants entered under them.
The judgment against the Mahoneys, therefore, bound Bliss
and O'Connell.

The probate papers and proceedings in the matter of the
estate of Reese were properly admitted in evidence. The
papers were stamped in conformity to the Act of Congress.
The letters to McMinn were stamped with an internal reve-
nue stamp of five dollars. That was the stamp then required
by the Internal Revenue Act, where the value of the estate
did not exceed fifty thousand dollars. (Stamp Act of 1862.)
The letters to McMinn, with a copy of the will and certifi-

cate of the Clerk under seal, was the probate of the will. It must be presumed that annexed to these letters was a copy of the will, and that the letters were in the prescribed form, (see Probate Act, Sec. 50,) and duly certified under seal. "A copy of the will by which the executor is appointed, certified under the seal of the Surrogate's Court, is usually called the probate or letters testamentary." (Dayton on Surrogates, 3d Ed., p. 212.) "The terms *probate of the will* and *letters testamentary* are convertible terms," etc. (Dayton, pp. 213, 214.) The language used in our Stamp Act is identical with that used in the Act of Parliament of England. (See Williams on Executors, 4th Amer. from the last London Ed., marginal page 496.) And at marginal page 509 he says: "The probate of the will　*　*　*　or letters of administration are used as synonymous terms." (See, also, marginal page 317; 2 Roberts on Wills, 1st Am. Ed., p. 45; Wharton's Law Dic, word *Probate*, p. 611.)

Satterlee's bond as administrator was stamped with a stamp of one dollar and fifty cents. It required no stamp at all. It was not such a bond as required a stamp. It was not an official bond. It was a bond in a legal proceeding, and within the exception.

The letters of administration with the will annexed, to Satterlee, were stamped with an internal revenue stamp of twelve dollars and fifty cents. The Probate Court required no greater stamp upon the proof of the value of the estate taken by that Court.

The only objection to Pierson's testimony was that it was "irrelevant and immaterial." Whether it was so or not, let this Court judge. Pierson testified to no communication made to him by Bliss and O'Connell, plaintiffs in the suit about which he testified. If it be admitted that Mahoney was Pierson's client in that suit, that is all we asked of this witness. Besides, Pierson testified to nothing privileged.

Tompkins had testified to nothing when the counsel for defendants objected to his testimony, except that he knew David Mahoney, George D. Bliss, and John O'Connell. Of

course, the Court properly overruled the objection. Tompkins testified to nothing communicated to him by Bliss and O'Connell, plaintiffs in the suit about which he testified. If it be admitted, as the making of the objection and point admits, that David Mahoney was Tompkins' client in that suit, and employed him therein, that is all we asked of this witness. Besides, Tompkins did not testify to any communication made to him even by Mahoney.

Bliss was an incompetent witness to prove the matter which defendants' counsel proposed to prove by him. (*Davis* v. *Davis*, 26 Cal. 26; *Kisling* v. *Shaw*, 33 Cal. 426.)

The charge of the Court is not, in fact, incorrect. When the Court says, "If a party is in possession of land by his tenant," the word *tenant* is used as synonymous with agent, subordinate, or employé. It does not mean a tenant under a lease, or for a term, or paying rent, or a person claiming as tenant. But if this part of the charge be apparently too broad or erroneous, it is immaterial, and could not affect the verdict, because Bliss and O'Connell do not claim that they were tenants.

*John Currey,* also for Respondent.

The judgment in the case of *Reese* v. *Mahoneys and others* established judicially Reese's right to the possession of the premises as against the Mahoneys, and consequently as against their grantees, Bliss and O'Connell. (*Long* v. *Neville*, 29 Cal. 134.) I apprehend the question as to the validity of the plaintiff's right to the possession of the property is not open, so far as the Mahoneys are concerned, nor so far as Bliss and O'Connell are concerned; provided, that whatever right and interest they (Bliss and O'Connell) acquired was acquired from the Mahoneys. This must be so, or else the judgment of Reese against Mahoneys was not a judgment binding parties and privies. I shall assume it as a proposition beyond controversy that this judgment bound the Mahoneys, and that it established *in judicium* Reese's right to the

possession of the land, not only as against them, but also against their privies in estate.

Then the next question to be determined is, was Bliss and O'Connell privies with the Mahoneys, or was their right, if they ever had any, derived from the Mahoneys? On this point there is no room for a moment's hesitation. They (Bliss and O'Connell) introduced in evidence the deed of February 16th, 1863, as the foundation of their pretended right and interest in the property, thus showing that their dependence for an effectual defense was upon the right, title, and interest of the Mahoneys, transferred to the defendants after the judgment of Reese against the Mahoneys had become a finality. If this was not the defendant's object, what was? Why introduce this deed, if it was not to show that the right, title, and interest of the Mahoneys, transferred to Bliss and O'Connell, was the merit and foundation of the defense to the action of the plaintiff, the administrator of the estate of Reese? If the defendants rest their right upon the deed from Soto to McDuffee and Addison, and the deed from McDuffee to Ward, and the deed from Ward to Smith, and the deed from Smith to David Mahoney, all of which antedated the action of Reese against the Mahoneys, then they are barred their defense by force and effect of the judgment in that action, because it was only through the deed from the Mahoneys of February 16th, 1863, that the defendants connected themselves with those deeds; and all the rights derived under and through those deeds were determined adversely to the Mahoneys by the judgment in favor of Reese against the Mahoneys. So the matter stands that Bliss and O'Connell, by the deed of February 16th, 1863, became privies in estate with the Mahoneys, and were under the law subject to the judgment against the Mahoneys, who, with all persons on the land, were properly ejected under the execution issued upon that judgment, which was effected on the 11th of April, 1863.

*T. I. Bergin,* and *S. A. Sharp,* in Reply.

Respondent, in answer to appellants, claims that Bliss and O'Connell were privies of the Mahoneys, and that, therefore, there was no error in the admission of the judgment in *Reese* v. *Mahoneys*. It appears from the transcript that "neither George D. Bliss or John O'Connell, the defendants in this action, were parties to said judgment" in *Reese* v. *Mahoneys*.

In the case of *San Francisco* v. *Lawton*, 18 Cal. 475, and in various cases since similarly decided, this Court held that there is no estoppel between grantor and grantee—that the latter may deny the title of the former, and may, consequently, buy his peace without prejudice to his rights independently of his conveyance. (*Bigelow* v. *Finch*, 11 Barb. 500.) Now, if a party takes a conveyance to his land from an adversary claimant without prejudice to his rights, consistently therewith no judgment theretofore recovered against his grantor can affect him. To so hold were to preclude him from such purchase at the hazard of having his rights in the premises swept from under him in virtue of some dormant legal proceedings of which he had no notice and to which he was not a party. The fact, therefore, that Bliss and O'Connell quieted their title by purchase from Mahoneys, cannot injuriously affect their rights nor make them subject to estoppels against Mahoneys. (*Grattan* v. *Wiggins*, 23 Cal. 39.)

The Probate Act prescribes the manner of probating a will in this State. "The testimony of each witness shall be reduced to writing, and signed by him," etc. * * * "If the Court shall be satisfied upon the proof taken, or from the facts found by the jury, that the will was duly executed, * * * a certificate of the proof and the facts found, signed by the Probate Judge and attested by the seal of the Court, shall be attached to the will." This is all to be properly recorded. This is what we understand to be the probate of a will in this State. It is the judgment of the Court authenticated in the manner indicated. (Probate Act, Secs. 23, 24, 25, 26.) And this is what is required by the Act of Con-

gress to be stamped. This is the construction given to similar statutory provisions in New York. (*Caw* v. *Robertson*, 1 Seld. 132; *Morris* v. *Keys*, 1 Hill, 540; *Hill* v. *Crockford*, 24 N. Y. 129.)

The statute provides (Probate Act, Secs. 27, 28) that all wills which shall have been duly proved and allowed in any other State, etc., may be allowed and recorded in the Probate Court of any county, etc., provided it has been executed in conformity with the laws of this State. "When a copy of a will and the probate thereof, duly authenticated, shall be produced by the executor, with a petition for letters, etc., the Court shall appoint a time for hearing, and notice shall be given in the same manner as in the case of an original will for probate." Will it be seriously contended that "the probate thereof" are merely the letters testamentary or of administration? Would any Court, upon the production of a copy of the will and a copy of the letters testamentary and of administration, admit a foreign will to probate? No. The probate of the will must be produced. It is this probate the Act of Congress requires to be stamped; and not having been stamped, the entire proceedings are void.

By the Court, SAWYER, C. J.:

This is an action to recover land in San Francisco. Both parties rely on prior possession in themselves and their grantors, and on title claimed to have been derived under the Van Ness Ordinance.

There is nothing in appellants' first point. The deed from Satterlee to Reese was certainly admissible, and the deed from Stevenson to Howard was referred to in that deed, and was only put in evidence as explanatory of it.

The defendants were strangers to the deed from Stevenson to Reese, and were not precluded from showing the purpose for which it was executed. (1 Greenl. Ev., Sec. 279; *Franklin* v. *Dorland*, 28 Cal. 178.) But the refusal to permit the

defendants to show that it was a deed in partition is wholly immaterial. The operation of the deed, and the several other deeds from the parties claimed to be the tenants in common, was to vest in Reese all the interest of those parties, whatever it was, in the land in controversy. The rights of Reese in the latter tract were precisely the same as they would have been had the object expressly appeared to have been a partition.

The next point is, that the papers in the matter of Reese's estate were improperly admitted for want of the proper stamp on the probate of the will. The clause of Schedule "B" of Stamp Duties involved is as follows: "Probate of wills, or letters of administration, when the estate and effects for and in respect of which such probate or letters of administration are applied for shall be sworn or declared not to exceed the value of two thousand five hundred dollars, fifty cents."

It is unnecessary, in the view we take of the point in respect to the stamping of such documents, to ascertain with exactness the sense in which the phrase "probate of wills" is employed in the Act. The evident purpose of the Act is, to impose stamp duties upon estates of deceased persons, upon which letters testamentary or of administration shall be granted. It is not a tax upon either class of documents *as such*, as is evident from the fact that the duty varies with the value of the estate. It can make no substantial difference in the result whether the stamp is affixed to the will, upon its being admitted to probate, or to the certificate of proof thereof attached, or to the letters testamentary, as they are parts of one judicial proceeding; and the object of the Act—revenue—is attained, if either document is duly stamped. We concur with the Court below in holding that the presumption, when the question arises in a collateral proceeding, is, that the Probate Court passed upon the question of the value of the estate on evidence, and that the District Court has no power to review the action of the Probate Court. The sufficiency of the stamp could not be tested

by the evidence of the value of the estate, produced when the letters were offered in evidence in another proceeding. Were the rule otherwise, the validity of proceedings for the settlement of the estates of deceased persons, and of rights acquired through such proceedings, would be dependent upon the contingency that another Court, in which the proceedings were offered in evidence, would make the same estimate as the Probate Court did of the value of the estate, based upon evidence, which, from its nature, must be conjectural and fluctuating.

Another point is, that the testimony of Pierson was inadmissible, on the ground that the matters to which he testified came to his knowledge through the relationship of client and attorney, and were within the rule protecting privileged communications. It is not clear that his testimony goes beyond stating by whom he was employed, and testimony to that extent, at least, is admissible. (*Chirac* v. *Rheinicker*, 11 Wheat. 280; 1 Greenl. Ev., Sec. 245; *Gower* v. *Emery*, 18 Maine, 82; *Brown* v. *Payson*, 6 N. H. 448; *Beckwith* v. *Benner*, 6 Car. & P. 681.) But concede that it did, this was not the ground of objection in the Court below. The objection and motion to strike out there were on the ground that it was "irrelevant and immaterial." The testimony was certainly relevant and material, and it is too late to raise, for the first time, the objection on the ground of privilege. The same point is made with reference to the witness Tompkins. In *Chirac* v. *Rheinicker*, *supra*, the question objected to on the ground that it sought a disclosure of matters coming to the knowledge of witness in professional confidence, was: "Were you retained at any time as attorney or counsel to conduct the ejectment suit above mentioned, on the part of the defendant, for his benefit, *as landlord of those premises?*" The Court held that part of the question, "*as landlord of those premises,*" (the italics are the Court's,) objectionable. The Court say: "It seeks a disclosure of the title and claim set up by Rheinicker to his counsel for the purpose of conducting the defense of the suit." No remark is made on that

clause of the question, "*for his benefit.*" This case carries the rule as far as any that has been called to our attention, and is contrary to the rule as stated in the text by Greenleaf in his work on Evidence, (1 Greenl. Ev., Sec. 245,) and as held in *Beckwith* v. *Benner*, 6 Car. & P. 681. Certainly so, unless the Court considered it proper to ask the witness whether he was employed by Rheinicker to defend the suit "*for his benefit.*" The inference is, that to this extent the question was thought proper. The rule, as stated by Greenleaf in the section cited, is that "the attorney may be compelled to disclose *the character in which the client employed him, whether that of executor or trustee, or on his private account, in order to let in the confessions of the real party in interest.*" And the question held proper in *Beckwith* v. *Benner, supra,* was, "Did the defendants, *as executors* of Mrs. Barber, employ Benner to act for them *as their attorney?*" In *Levy* v. *Pope*, Moody & Mal. 410, it was held that the attorney conducting a cause in Court may be called as a witness by the opposite side and asked who employs him, "*in order to show the real party, and so let in his acts and declarations.*" (6 N. H. 449; 1 Greenl. Ev., Sec. 245.) These authorities establish the rule that the attorney may be compelled to disclose the character in which the client employed him; and even *Chirac* v. *Rheinicker* goes so far as to recognize the propriety of the disclosure that the client employed the attorney to prosecute or defend *for his own benefit*, and it must be, in the language of Greenleaf, "*in order to let in the confession of the real party in interest.*" The distinction between the rule as thus established and that which forbids the addition of the clause that Rheinicker defended "as landlord of the premises," certainly seems thin. It is further to be observed that, as this rule has a tendency to prevent the full disclosure of the truth, it ought to be strictly construed. (*Foster* v. *Hill*, 12 Pick. 97; *Gower* v. *Emery*, 18 Maine, 82.)

In view of this rule of construction, and of the rule established by the authorities cited, let us examine the testimony of Tompkins. If there is anything in the testimony of

Tompkins that looks toward a violation of the rule, it is found in the following passage, the first clause of which, at least, seems to have been volunteered, with no special notice taken of it at the time or subsequently by counsel; "I may also state that I considered that the Mahoneys had rights at the time, *and I considered that Bliss had rights at the time.* I think I have known David Mahoney about eight years—it may be less. I have never known about his business intimately; I know that he had been doing butchering, that is, slaughter house business; *I do not know that I have ever talked with him about his business.* Prior to my becoming attorney for Mahoney, I do not know anything in relation to his claiming the land in controversy in this suit." If there is anything embraced in this passage improperly admitted under the rule, we are unable to perceive it; and the rule is to be *strictly* and *not liberally* construed. The first clause is a volunteer opinion, not objected to at the time, that Mahoney had rights. It states no fact whatever communicated to him by Mahoney, upon which the opinion was based. Admit that Mahoney *had* rights at the time, it only goes to the extent of showing that he was the client, acting for his own benefit, and this, we have seen, is admissible, even under the case of *Chirac* v. *Rheinicker.* There is no statement whatever indicating the character of those rights. Besides, at the same time, he expresses an equally unqualified opinion that *Bliss also had rights,* which is the important question in this suit, and so far the testimony is more in *favor* of than *against* appellants. We do not perceive that the clause, "I know that he had been doing butchering, that is, slaughter house business," affects the question. Besides, it does not appear that he acquired *this* knowledge through any confidential communication. Knowledge acquired during the time he is attorney is not privileged, unless it is acquired in the course and for the purposes of his employment. He says: "*I do not know that I ever talked with him about his business.*" He could not, therefore, have well got this knowledge of the business in the course of his confidential employment. The

only remaining clause is that "prior to becoming Mahoney's attorney, I do not know anything in relation to his claiming the land in controversy in this suit." He does not say that he knows anything of his claim now, or, if so, what he knows. Admit that, inferentially, he is regarded as saying that Mahoney did set up some sort of claim to the land, *without saying what its character was*, this, still, only shows that he was a *client*, prosecuting a suit, in some way, for his own benefit, without disclosing his title or in any respect the nature of his claim, and is admissible under the rule, as most strictly limited. There is nothing else in Tompkins' testimony tending in the remotest degree to indicate any confidential communication, or going in that direction, beyond showing who employed Tompkins—who his client was.

But there is another view fatal to the point. There was no objection or exception taken to any part of the testimony that can possibly be claimed to be objectionable in such manner as to be available. Witness testified: "I am an attorney; I have been practicing in this city and county several years; I know David Mahoney, George D. Bliss, and John O'Connell, defendants in this suit." Defendants' counsel objected to this testimony, as immaterial and irrelevant, and as requiring of the witness what he knows by no means except through his professional relation with his client. The Court overruled the objection. Defendants' counsel duly excepted. So says the record. There is no other objection or exception stated in the record. What was it that the Court ruled upon? We have given all that the witness had *then* stated, and *no further question appears to have been then asked*. It had not even appeared that the relation of client and attorney had existed. And counsel "objected to *this* testimony." The Court certainly ruled on the matter before it, and nothing more. The several pages of testimony subsequently given was not before it, either by the statement of the witness, or by a question propounded to the witness, or by any offer to prove it, or in any shape whatever. Neither the Court nor defendants could possibly

have anticipated what the witness was about to state, or what the plaintiff desired to prove, and the Court was not in a position to rule upon it, or the defendants' counsel to object to it. Nor does the objection and exception purport to extend to, or the Court to rule on testimony to be afterward given, but to the testimony already before the Court. Nothing had been stated or offered at the time of the objection and ruling from which it could have been guessed, even, that the relation of attorney and client had ever existed between the Mahoneys and Tompkins, or that the testimony to be given would have any connection with that relation. There was nothing before the Court, at the time, upon which it could have made any other ruling than it did. It was, therefore, correct at the time the ruling was made, and the propriety of the ruling could not be changed by any *subsequent testimony* that was offered or introduced *without further objection.* If the plaintiff at any subsequent stage of the examination offered any improper testimony, the time to object was when it was offered, and the matter was before the Court. After this ruling the witness gave testimony covering two printed pages, not a word of which can be construed to be inadmissible under the rule relating to privileged communications before the passage before quoted and commented on occurs, and no objection was made to any of it as it was presented to the Court, or at any time afterward. If the objection, at the time, and in the form in which it was made, could be regarded as extending to the whole testimony of this witness subsequently given—and we have seen that it cannot—such a mode of taking objections and exceptions, covering all that a witness may subsequently say, whether proper or improper, without knowing what is expected to be proved by him, would be intolerable. The party offering evidence is entitled to have the particular portion of evidence objected to pointed out, and the specific ground of the objection stated, in order that he may obviate the objection or waive the testimony, if he is unwilling to take the risk of error. When a witness takes the stand the opposite party

might just as well say: I object to all the testimony this witness is going to give, except to the overruling of the objection, then go through a long examination without further objection, and if it should turn out that a few lines of it are improper testimony, claim that the judgment should be reversed on that ground. If exceptions like the one in question could be regarded on appeals, there would be but little chance for obtaining verdicts which could be held.

There was no error in excluding the testimony of defendant Bliss. A party, by the express provisions of the statute, is not permitted to testify "where the adverse party, or the party for whose immediate benefit the action is prosecuted or defended, is the representative of a deceased person, when the facts to be proved transpired before the death of such deceased person." (Prac. Act, Sec. 393.) The statute covers all cases coming within its general terms, and makes no distinctions depending on privity or connection between the parties. Satterlee was the administrator and representative of Reese, deceased, and the matters to which defendant Bliss was offered as a witness transpired before the death of Reese. There is nothing to take the case out of the statute, as construed in *Davis* v. *Davis*, 26 Cal. 32, and *Kisling* v. *Shaw*, 33 Cal. 446.

There was no error in denying defendants' motion for a nonsuit. If the fence built in 1860 was, as some of the witnesses say, constructed of posts and boards, and three boards or two boards and a cap high, we cannot say that it was not a substantial fence, and that this, in connection with the house subsequently built by Ensign within the inclosure, and the occupancy of the same for the purpose of maintaining the possession and exercising control and dominion over the land thus inclosed and claimed, did not constitute an actual possession within the meaning of the Van Ness Ordinance. The testimony of the witnesses tends to show that this was, for that day and location, an unusually substantial fence. Whether the fence was maintained and kept in repair till the erection and occupation of the house and premises by

Ensign, and the possession thenceforth continued till the entry of the defendants, was a question for the jury. The testimony was undoubtedly conflicting, but there was enough to require the submission of the questions of fact to the jury. The law of the case arising under the Van Ness Ordinance was stated in the charge with unusual accuracy, clearness, and precision.

Again, upon the testimony there was ample cause for submitting the case to the jury upon another ground, having no relation to the point last discussed. It appears that these defendants were before turned out of possession under the writ issued in the case of *Reese* v. *Mahoney et al.*, and afterwards re-entered; that about the time of the issuing of the writ in that case, they received a conveyance of the premises from the Mahoneys; and in connection with this testimony there was other testimony tending strongly to show that at the time of the commencement of the suit of *Reese* v. *Mahoney et al.* these defendants were on the premises with the Mahoneys in the character of servants, employés, and subordinates of the Mahoneys only; and the testimony on this point is of such a character that, if the jury had specifically so found the fact to be, we could not disturb the verdict. There is testimony to the contrary, it is true, tending to show that they were there on their own account, claiming in their own right; but it must be confessed, that, if such was really the state of the case, this testimony is not so clear in favor of the defendants as we should expect to find it. If they were there in their own right for a long time doing a very extensive wholesale butchering business on their own account, it would seem that the means of proving the fact beyond the possibility of doubt must be in their power. They would certainly be in a better position to establish this hypothesis than the plaintiff the contrary one. But, however this may be, the evidence is such that, had the jury found either way on this point, under the long established rule of appellate Courts upon the subject of conflicting testimony, we could not

65

have disturbed the verdict. If, then, these defendants were on the land at the time of the commencement of the suit of *Reese* v. *Mahoney*, merely in the character of servants, employés, and subordinates of the Mahoneys, having no other interest in their own right, their acts in such character were the acts of their masters and employers, and not their own, and they were properly turned out under the writ; and no subsequent entry under the Mahoneys, or in collusion with them, or under the title determined in that action, would be available to protect them. If the jury should find against the defendants on these points, and that they had no other right or title, such finding would be conclusive against them. In this aspect of the case, therefore, without any reference to title under the Van Ness Ordinance, the testimony was such as to require a submission of the case to the jury.

The judgment in the case of *Reese* v. *Mahoney et al.* is binding and conclusive upon the Mahoneys, and all parties standing in privity with them, and estops them from denying that Reese was entitled, as against them, to the possession of the premises at the time of the rendition of the judgment. (*Caperton* v. *Schmidt*, 26 Cal. 491; *Marshall* v. *Shafter*, 32 Cal. 176.) Privies, within the meaning of the rule, are those who entered under, or acquired an interest in, the premises from or through, or entered without title in collusion with the Mahoneys subsequent to the commencement of the action. The deed from the Mahoneys to the defendants, made since the commencement of the action of *Reese* v. *Mahoney*, establishes such privity, and authorized the introduction of the judgment roll in that action by way of estoppel as against the title so acquired. There was testimony, also, as we have before seen, tending strongly to show, that at the time of the commencement of that action the defendants were actually on the land, in employment as servants, employés, and subordinates of the Mahoneys, and not in their own right. If they were there in the employment of the Mahoneys in the character of agents, servants,

employés, etc., *only*, then their acts of possession were the acts of their principals, masters, and employers, the Mahoneys, and the possession acquired and maintained thereby, was also the possession of the Mahoneys and not their own, and the judgment was conclusive upon them, and they were legally and properly turned out under the writ, and the record upon the state of the evidence was also admissible with respect to this point. The present defendants were not parties to the former suit, and they are not estopped by the judgment in that action with respect to any title not then in issue and determined. If, then, they were in fact in the actual possession, not as servants, employés, subordinates, or agents of the Mahoneys, but in their own right, claiming adverse to the Mahoneys, or by title derived from the Mahoneys prior to the commencement of the suit, such claim or title was not affected by the said judgment, nor is any title acquired from any source since the commencement of that action not derived through the Mahoneys, nor, if derived through the Mahoneys themselves, if it came to the Maho-neys subsequent to the rendition of said judgment. For no such claim or title was in issue or determined in said action. The judgment in the case of *Reese* v. *Mahoney* is conclusive, however, upon the title derived through the deed in evidence from the Mahoneys; and the defendants, standing in privity with the Mahoneys, are estopped by the judgment as to *that title*. This title, therefore, constitutes no defense in this action. But they are entitled to avail themselves of any other title not determined in that action.

In the charge given by the Court, of its own motion, the following passage occurs: "If you are satisfied from the evidence that the defendants Bliss and O'Connell, or any of the defendants in this action, were, at the time of the commencement of this action (*Reese* v. *Mahoney*) in the Twelfth Judicial District, in the possession of the property in controversy, under David and Dennis Mahoney, as tenants by their permission, *independent of any other right or title, or procurement*, then the defendants in this action, or *such of them*

*as so occupied*, are estopped from setting up any claim to the premises in controversy, except such as they have subsequently acquired." This passage, as a legal proposition, is undoubtedly erroneous, and if it could have affected the verdict, the judgment would have to be reversed on this ground. The principle announced in this passage is directly in conflict with that stated in the very next, which reads: "But if you find that David and Dennis Mahoney, or either of them, or any other person, had the title to the premises before the commencement of such action, and conveyed the title to the defendants, or either of them, prior to the commencement of such action, then and in that case the judgment would not be a bar against the defendants, who received such conveyance, nor would it be an estoppel as against any title by them subsequently acquired." This is correct. The only title in issue was that which was in the Mahoneys at the time, not a title which they once had and conveyed to somebody else *before* the commencement of the action. The title of Bliss and McConnell, no matter from whom derived, could not be tried and determined in an action to which they were not parties. They are entitled to be heard. They must have their day in Court. They might make a better defense than the parties from whom they derived title would be inclined to do after they ceased to have any interest in the matter. But whether they could or not, their right could not be determined in an action to which they were not parties. *Their* title would not be in issue. They are not in privity with the defendants in the action with respect to that suit. If, however, they enter, or take title from the defendants in a suit after action brought, they take with notice and succeed to the perils of the action, whatever they may be. They stand in privity with the defendants with respect to the action, and can acquire no greater rights or better position than the parties had whose interest they acquired. This is plain with reference to the grantee of the *entire* estate—the fee. But a lessee or tenant to the extent of his estate—that is to say, so far as his term acquired before suit brought is

involved—stands in just as strong a position as the grantee of the fee. He does not, it is true, hold the entire estate. He, however, holds an *estate in his own right*, carved out of the larger. He has an estate which he holds in his own right against the lessor, although under him, and all the world, which can no more be cut off, abridged, limited or affected by the lessor, or anybody else, than an estate in fee. The quantity of his estate is less, but it is the same in quality, and, to the extent of the interest held, is as independent and absolute before the law as an estate in fee. There is, in the case of a lease, an estate for years with remainder in the lessor. In an action against the lessor to which the lessee is not a party, only the right of the *lessor* is in issue, and can only extend to the remainder. The right or estate of the *lessee* is not in issue, for, on that he is entitled to be heard. His rights, acquired prior to suit brought, are adverse to the lessor, and they can no more be affected in an action to which he is a stranger, than if his estate was larger. He might make a better defense than the party under whom he claims could, or would do. At all events he is entitled to be heard in his own behalf. If it were otherwise, parties holding long and valuable leases, of which the lessors were anxious to get rid, might by collusive suits brought by strangers against the lessors, be deprived of their estates. It is very clear, then, that the portion of the charge to the jury, which states that if the defendants were in possession *as tenants* of the Mahoneys, before the commencement of the suit of *Reese* v. *Mahoney*, they are estopped by the judgment from setting up any claim except such as they had subsequently acquired, as a legal proposition cannot be maintained. For *if they were tenants* of the Mahoneys at the time of the commencement of the suit, they had an estate in their own right, of which they could not be deprived by any action, or failure to act, of the Mahoneys, and which could not be affected in a suit to which they were not themselves parties. Such estate had already passed from the

Mahoneys, and was not in them during the pendency of the action, and could not, therefore, be in issue.

This error having been committed, it becomes necessary to ascertain whether it could have in any way affected the judgment unfavorably to appellants. If not, then it is without consequence, and is no ground for disturbing the verdict and judgment. We have carefully read the whole record of upwards of sixteen hundred printed folios from beginning to end, without finding any evidence tending to prove that the defendants, either before or since the commencement of the action of *Reese* v. *Mahoney et al.,* held, or claimed to hold, *as tenants* of the Mahoneys. Such a position is not in any sense the theory of the defense. They set up no such claim in their pleadings, and, so far as the record shows, made no such claim at the trial; and they, in fact, make none now. In their answer, they first deny generally the allegations of the complaint, then, in various forms, set up the Statute of Limitations; and then, in a separate answer, affirmatively allege *seizin in fee* in themselves, and *not a tenancy under the Mahoneys.* The claim on the *part of the plaintiff* was, and the testimony tended strongly to prove, that the defendants in the case of *Reese* v. *Mahoney et al.,* were the parties, and the *only* parties in possession at the time of the commencement of that action, and that all other parties on the premises, including the present defendants, were subordinate to the Mahoneys, in their employment in the capacity of servants, employés, etc., and *not* as tenants or as parties having any interest of their own. On *the part of the defendants,* the claim was, and the evidence tended to show, that they were there not as servants and employés of the Mahoneys, but in their own right, claiming for themselves, and having no connection whatever with the Mahoneys. There was no claim on their part that they were there *as tenants* of the Mahoneys, and we find no testimony tending in any degree to show that condition of things. Appellants' counsel do not point out any such testimony, or now claim, in their briefs, that there was any, or that they ever pretended to oc-

cupy such position. Indeed, they could not, with any appearance of sincerity, make any such claim, on the record as now presented. They say the instruction was erroneous as a legal proposition, which is true, and in their brief in reply they say, not that there was any claim or evidence to which the instruction was applicable, but that it is not for the jury "to determine that instructions are material or immaterial;" that they are bound to "apply all instructions given to the evidence in the case," and that if any are erroneous, there must be a new trial. But we have held a great many times that we will not reverse a judgment for an error which, we can see from the record, could not possibly have injuriously affected the appellant. Now, we have seen that there is no evidence upon which the jury could possibly have found that the defendants were in possession as tenants of the Mahoneys at the time of the commencement of the former suit, and that such was not the theory of defendants' case. If the jury had so found, it would have been without evidence to support the finding, and the finding could not be permitted to stand. The worst that can be said is, that the erroneous part of the charge withdrew from the jury a hypothesis which had nothing in the case to support it, and which the defendants were not entitled to have considered at all. This error in no respect affected any of the questions presented by the issues and evidence, and the jury were still necessarily required to pass upon all the questions of fact really in the case. It follows, therefore, that the fact upon which the erroneous part of the charge would have operated against the defendants was not, and could not have been, before the jury. The charge, so far as this point is concerned, was wholly abstract. An abstract charge may sometimes be injurious, but it could not be to these appellants, under the conditions shown by the record in this case.

It has been suggested, also, that if defendants were tenants of the Mahoneys at the commencement of the former action, this portion of the charge, because of that relation, would preclude them from relying in this action on any independent

adverse title of their own, even if it was better than that of either party to the former action, and that the charge is objectionable on this ground. But this suggestion arises from overlooking the clause, "independent of any other right, or title, or procurement." That is to say, if they were tenants of the Mahoneys, *not dependent upon any other right or title*, or, in other words, *not claiming under any other right or title*. The meaning clearly is, that if the defendants were there claiming *solely* as tenants of the Mahoneys, then they were estopped, etc. It does not say, however, that they would be estopped by the judgment if they claimed in their *own right* in some other character or under some other title. This portion of the charge was not directed to other claims, but was carefully confined to a claim *as tenants*. The clause cited, therefore, is an important qualification, which fully covers the supposed objection, and there is no error in this particular.

The only other point made in appellants' briefs, is, the general one, covering a number of instructions, that the Court erred in not granting the several instructions asked by defendants, stating that they "were correct and pertinent," and this is all there is said about them.

Without taking any more trouble to discuss the points than counsel have, we think they were properly refused. Some are plainly not pertinent, and others, at least, require qualification. In the brief in reply, however, appellants' counsel do make some attempt to maintain the correctness of the first instruction asked by them, and refused by the Court. But it is perfectly clear that this instruction could not have been properly given in view of the evidence. It entirely ignores the hypothesis as to the defendants being on the land with the Mahoneys, *as their servants*, at the time of the commencement of the suit of *Reese* v. *Mahoney*, and as to their acquiring possession and an interest in privity with the Mahoneys *pendente lite*, without any other claim or title. On this hypothesis there was no necessity for suing them, for they would be concluded by the judgment, and have to go

out under the writ in that action.  An instruction which does not take this element into account could not be correct in view of the evidence.

There was nothing in the charge of the Court, or instructions given, extending the estoppel of the judgment in *Reese* v. *Mahoney* to any title or right disclosed by the evidence, not determined by that action, or withdrawing from the consideration of the jury any right or title, which the evidence tended to show, held by defendants in their own right, at the time of the commencement of the suit of *Reese* v. *Mahoney*, or any right or title subsequently acquired, not concluded by that action.

Respondent presents certain instructions having an important bearing on the rights of the parties, which are shown by affidavit to have been given to the jury at the request of appellants' counsel, but which were *never introduced into the statement* on motion for new trial, and moves for an order directing the said instructions to be added to the statement. We have often held that it is no part of the province of this Court to amend the records of the Court below.  The record in this Court is a transcript of the record of the Court below, and we decide the case upon the same record considered by the Court below.   The Court below decided the motion for new trial upon the statement as it is now presented.   If we should amend the statement by adding these instructions, we should decide it upon a different record, and we should not be reviewing the action of the Court below, but act upon another and different case.   If we could amend the statement in this particular, we could in any other.   But we have no means of correcting the records of other Courts.   We have no authority to say what their records are or shall be. We can only act upon a transcript of the record as it exists in the lower Court, duly authenticated in the mode prescribed by law.   This we have repeatedly held.   (*Bonds* v. *Hickman*, 29 Cal. 461; *Boston* v. *Haynes*, 31 Cal. 107; *Buck-*

*man* v. *Whitney*, 24 Cal. 267; *Buckman* v. *Whitney*, 28 Cal. 555.)

In making up a statement on motion for new trial, the respondent should see that everything favorable to his side, bearing upon the points specified, is supplied by amendment if omitted by the party proposing the statement. And it sometimes happens that instructions given, upon which no question arises, are important as obviating the objections taken in respect to others specified as grounds of error in the statement. In such case it is important to the party interested to see that they are introduced into the statement.

We find nothing in the record to justify a reversal of the judgment in this case.

Judgment and order denying a new trial affirmed.

Mr. Justice RHODES expressed no opinion.